**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

*Eastern District of Kentucky*
**F I L E D**

AUG 1 1 2022

AT FRANKFORT
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

RON MILLER,

     PLAINTIFF,

Mailing Address: 101 N. Bradord Lane,
Georgetown, KY 40324
500 E. College St., Georgetown, KY
303-264-8580

v.

ALCO MANAGEMENT, INC.; ALCO FAIRFAX

PARTNERS LLLP; ALCO PROPERTIES, INC.; JUDY K

DEVERS, a/k/a JUDY K CLEMONS; BETH STOLTS,

individually and as an employee of Alco

Management, Inc.; CINDY GULLET, individually

and as an employee of Alco Management, Inc.;

FRANK Z. JEMISON, JR., individually and as an

employee of Alco Management, Inc., and as CEO

of Alco Properties, Inc.; ROBERT D. HYDE,

individually and as President of Alco

Management, Inc.; LEWIS CRUMP,

GEORGETOWN POLICE DETECTIVE, individually

and in his official capacity; and CITY OF

GEORGETOWN (KENTUCKY)

CASE NO. 5:22 cv 208 GFVT

## COMPLAINT FOR VIOLATION OF FAIR HOUSING ACT & CIVIL RIGHTS and DEMAND FOR JURY TRIAL

     As is permissible pursuant to Form EDKy 520 instructions, Plaintiff has drafted his own

Complaint, which does contain all the information required in such Form, and therefore, Plaintiff will not

file EDKy 520.

### NATURE OF THE CLAIM

     This case arises out of lease contract entered into between Plaintiff Ron Miller ("Miller") and Alco

Fairfax Partner, LLLP, for a residental apartment known as "Southern Oaks Apartments", which

represented to Miller prior to execution of the contract, that it was a nonsmoking property, upon which

Miller relied and the determining factor for his decision to execute such contract, as Miller is an individual suffering from a medically verified respiratory issue that is exaserbated by cigarette and cigar smoke; and the subsequent joint and several actions of Defendants, to force Miller from his Constitutionally protected Section 8, Housing Choice Voucher ("HCV") property interest, as determined by the U.S. Supreme Court in *Goldberg v Kelly, 397 U.S. 254,* including, but not limited to, utilizing their direct and indirect personal relationship(s), also known as "the good ole boy/girl network" or "cronyism", in small town Kentucky, with Lewis Crump, a detective with the Georgetown Police Department, who then harassed, threatened, and intimidated Miller by lying to the court, fabricating evidence which he then reported to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and threatening Miller with arrest if he made anymore complaints about Defendant Judy Devers to anyone, including lease violations to any employee of Alco Management, Inc., agent for Fairfax Partners, L.L.L.P., a/k/a Southern Oaks Apartments.

Miller brings this civil rights action for declaratory relief as well as monetary and punitive damages against each and every Defendant[1], under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended; 42 USC ¶¶ 3601-3631; Titles II and V of the American with Disabilities Act of 1990 ("ADA"); 42 USC ¶¶ 12131-12134; as well as Title II's implementing regulation, 28 CFR Part 35.  In addition, Miller brings this civil rights action against Defendant Lewis Crump pursuant to 1) 42 USC 1983, who, under color of law, deprived Miller of his rights, privileges, and immunities in his constitutionally recognized, protectable Section 8 property interest and 2) the Fourth and Fourthteen Amendments of the United Constitution, including, but not limited to, violation of the Equal Protection Clause and Unreasonable Search and Seizure, when he, without due diligence, knowingly and purposefully falsified a petition and affidavit to obtain a search warrant permitting him to obtain Miller's personal identifying information in possession of Alco Fairfax Parters LLLP, i.e., Southern Oaks Apartments.  Furthermore, Miller brings suit

---

[1] Acting alone or in concert with one or more of the other Defendants

against each of the Defendants, who, acting alone or in concert with one or more of the other Defendants, tortiously interfered with Miller's Alco Fairfax Partners LLLP (doing business as Southern Oaks Apartments) contract; interfered with Miller's rights to quiet enjoyment, including, but not limited to, smoking in a smoke-free environment, physically threatening Miller for his complaints against them, and letting their animals lose to defecate at and around, Miller's door.  As to Defendant Alco Management, Inc. and Alco Fairfax Partners LLLP, Miller brings this action against them, pursuant to the doctrine of Respondeat Superior, based upon the actions and/or inactions of employees Beth Stolts; Frank Z. Jemison, Jr.; Robert D Hyde; Elaine Nicole "Nickee" Hall; Troy Ross[2]; Cynthia Gullett; as well as, other employees of Alco Management, Inc., whose names and/or identities are currently unknown by Miller.  As to Lewis Crump, in both his official and individual capacities as a Detective with the Georgetown Police Department, Miller, additionally, brings this suit based upon the policies, ordinances, regulations, decisions, and customs of the Georgetown Police Department that deprived Miller of his Constitutional and/or Federal statutory rights. Miller seeks monetary damages, declaratory relief, and injunction for violations to his clearly established rights.

## JURISDICTION & VENUE

1.      This Court has jurisdiction over this action and may grant the relief sought herein pursuant to 28 U.S.C. §§ 1331 and 1345; 42 U.S.C. § 3614(a); 42 U.S.C. §§ 12133 and 12134; 42 U.S.C. 1983, and 28 U.S.C. §§ 2201 and 2202, as they are federal claims, with supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC 1367(a).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391 and 1443 because the events or omissions giving rise to Plaintiff's claims occurred in this district. 25 USC 1391

## THE PARTIES

---

[2] Which Miller simply knew as Troy, prior to his receipt of the Investigative Report of Lewis Crump, which Miller received on July 28, 2022.

3

3.    Plaintiff Ron Miller ("Miller") is a 64-year-old disabled male who, from May 2019 through July 2020, resided at 166D Fairfax Way, Georgetown, KY, 40324, an apartment complex owned by Alco Fairfax Partners, LLLP, d/b/, Southern Oaks Apartments.

4.    Defendant Alco Fairfax Partners, LLLP ("Alco Partners"), d/b/a Southern Oaks Apartments ("SO") in Georgetown KY, is a domestic entity whose principal office is located at 35 Union Ave., Ste. 300, Memphis, TN 38103. Although Alco Partners reported to the Kentucky Secretary of State, in its February 2022 report, that Preston Worley, 201 E. Main St., Ste. 1000, Lexington, KY 40507 is their Registered Agent, Preston Worley's office has denied such.

5.    Defendant Alco Properties, Inc. ("Alco Properties"), the General Partner of Alco Partners LLLP, is incorporated in the State of Georgia and reports as their principal place of business, 35 Union Ave., Ste. 300, Memphis, TN 38103. Pursuant to Georgia's Secretary of State, Frank Z. Jemison Jr. is its CEO.

6.    Defendant, Alco Management, Inc. ("Alco Management"), acted as "agent" for Alco Partners LLLP in the residential lease contract entered into by Miller. Alco Management, did at all times during Miller's tenancy, manage the property known as Southern Oaks Apartments. According to the Tennessee Secretary of State, Alco Management is a Tennessee corporation whose principal place of business is 35 Union Ave., Ste. 300, Memphis, TN 38103, and its Chairman of the Board is Frank Z. Jemison, Jr, who, at the time of Miller's tenancy, was Alco Management's CEO. Alco Management did not report to the Tennessee Secretary of State, a designated Registered Agent, and Miller has been unable to identify such a designate.

7.    Judy K. Devers ("Devers"), currently self-identifying as Judy K. Clemons[3] per her Facebook page, is a female individual who, at all times relevant to Miller's complaint, resided at 166C Fairfax Way, Georgetown KY 40324, such apartment sharing a common wall with Miller's apartment. Devers is a/k/a "juju", currently resides with Kenny Hicks at 4276 Myers Rd, Carlisle, KY 40311.

---

[3] Miller does not know if Devers has had a lawful name change or is using a pseudonym

8.     Beth Stolts ("Stolts"), in an email to Miller dated March 24, 2020, held herself out as the "Senior

Regional Property Manager' of Alco Management; from March 24, 2020 through, at least, August 8,

2020, Stolts was active in all matters relevant to  this Complaint. At all times relevant to this Complaint,

Stolts was, and still remains, a permanent resident of Wilson County TN, 1706 Wrencrest Dr., Mt. Juliet,

37122; Stolts has retired from Alco Management.

9.     Cynthia Gullet ("Gullet"), acting manager of Southern Oaks Apartments from February 2020 until

an unknown date past Miller's vacancy from Southern Oaks, is a resident of Mercer County, KY, 160

McClellan Dr., Harrodsburg, KY 40330.

10.     Lewis Crump is a Detective with the Georgetown Police Department, Georgetown, KY, located at

550 Bourbon St, Georgetown, KY 40324.

11.     The City of Georgetown KY is the applicable municipal entity with control over the Georgetown

Police Department. The City's agent for service of process is Devon E. Golden, whose address is 100

North Court Street, Georgetown, KY 40324.

### FACTUAL ALLEGATIONS

12.     Miller incorporates herein by reference, his Affidavit in Support of Complaint ("Miller's Affidavit").

References to relevant times in audio and video files shall be reflected as, e.g., @1:24, indicating one

minute and twenty-four seconds into the recording.

13.     Desiring to relocate from Florida to Georgetown, KY, Miller, in the Fall of 2018, began searching

for apartment availability, but because he was utilizing a HUD issued HCV, his options were limited to

lessors who would accept such HCVs; despite this limitation, Miller was able to locate 5 different

properties who stated that they would have availabilities around the time that Miller sought move-in;

each property, ultimately, approved Miller's application to move in.

14.     Of these five, S.O. offered fewer amenities and its two bedroom apartments were smaller in size,

however, Miller viewed it as the highest priority due to their representation that they were a non-

smoking property, which he desired because of his respiratory condition and sensitivity/irritation to

cigarette and cigar smoke.

15.     Miller, hoping for an apartment at S.O., later informed three of the five properties that he was

going to pass. On or about the last week of February 2019, S.O. notified Miller that they would soon

have an availability, and although Miller had already done a great deal of the necessary paperwork,

remotely from Florida, S.O. required that he travel to Georgetown to inspect the apartment, and

complete additional paperwork which they stated had to be done in person.

16.     Miller arrived in Georgetown in March 2020, and when he inspected of the apartment, was

disappointed to see that some of the repairs which should have been done in preparation of a new

tenant, were not done or were done unsatisfactorily, e.g. 1) there was 2 foot wide bulge in the living

room wall resulting from a plaster patch job which actually required replacement of the sheetrock, 2)

they didn't repaint an entire room, they only spot painted patching, leaving an obviously noticeable

mosaic of mismatched paint, and 3) the closet doors would not stay on their tracks, even after Troy Ross

("Ross"), S.O.'s maintenance man, had just told Miller that he had just finished repairing them[4].

17.     Instead of acknowledging that the doors needed to be replaced, Ross stated that he would

remove the defective doors and that Miller could install a shower rod and hang curtains.  Miller

responded to the incident by sending an email to S.O. management, informing them that he was quite

disappointed in the condition of the apartment. S.O. replied that these problems would be taken care

of, and, given S.O.'s representation that it was a non-smoking facility, which was Miller's deciding factor

in moving into S.O., Miller gave S.O. the benefit of the the doubt, hopeful that it was just a blip of

misfortune, and that things would work out in the long run; Miller, therefore, committed to entering

into the lease contract with Alco Management, Inc., as Agent for Alco Fairfax Partners, LLLP.

Additionally, S.O. placed in their small office lobby, copies of their No Smoking Policy.

---

[4] As he spoke, he attempted to demonstrate how they were working, but the door fell of in his hands.

18.    On May 5, 2019, Miller arrived in Georgetown from Florida and on May 6, 2019, signed a lease for

the period May 6, 2019, through May 31, 2019 ("Initial Lease"), but not without a hitch. Although Miller

had been informed that natural gas was included in the rent, S.O. manager Elaine Nicole "Nickee" Hall

("Nickee") was insistent that Miller sign documentation indicating that he would be responsible for such

cost, however, since Nickee had already informed the Georgetown Housing Authority ("GHA") that

natural gas was included, GHA got involved, and S.O. relented to including natural gas in Miller's rent.

19.    Not only did the Initial Lease explicitly state "**<u>SMOKE FREE</u>**", "**It is a violation for the Community**

**Rules for any resident, guest, visitor, contractor, and/or staff persons to smoke in any area of the**

**property**" {emp} **(Exh. "A.1"),** but non smoking signs were visably placed on two sides of the property

**(Exh. A.2 & A.3),** with two other non smoking signs visably placed outside the S.O. office, near the front

door. See **(Exh. "A.4")**

20.    On May 6, 2019, the very first day of Miller's tenancy, he smelled cigarette smoke within his

apartment. Over the two weeks, Miller observed at least eight individuals walking around openly

smoking, including Thomas and her friends, Devers' sister and grandson[5], and a group of individuals who

would congregate in the parking lot across from Miller's apartment; Miller quickly learned that this

smoking was routine.  Thomas was, in fact, the very first person Miller saw smoking, when she

approached him on or about his second day of residency, with lighted cigarette in hand, smoke expelling

from her mouth.

21.    On May 16, 2019, Miller emailed Nickee, S.O. property manager, regarding individuals who had

walked by him as they headed to a building behind his; Miller, inquiring whether that was S.O. property

asked, "and no smoking anywhere, right?"  **(See Exhbit "B")**

---

[5] Not long after his move-in, Miller learned that Devers' grandson, Cordale Devers ("Cordale"), was living with her;
in fact, Cordale's mail was twice, inadvertantly, placed in Miller's mailbox. Sometime in 2020, Miller learned that
Cordale was not supposed to be living there because he was not on the lease.

22.    On June 4, 2019, Miller again addressed the alleged "non-smoking" policy when he went to the office to pay rent and stating that he did not want to be the S.O. policeman, remarked to Nickee, **"a lot of people smoke here"** {emp}, to which she replied, "I've sent out Notices and I literally have to catch them before I lease violate them ... if you can catch it, a picture, I have to have proof ... of them actually doing it." **(Audio exhibit "C" @ 1:20)**

23.    Miller is disabled, among his disabilities is a respiratory condition which is exacerbated by cigarette and cigar smoke, such smoke is not merely an unpleasant smell, but an irritant that 1) severely inflames his sinuses, completely "clogging" his nasal passages to the point that he cannot breathe through his nose, which thereby, causes sinus pressure that results in extreme and intense headaches (think sinus infection) and 2) induces severe asthmatic attacks that require Miller to use a prescription inhaler. In fact, when Covid hit in 2020, Miller's physician, on two separate occasions, suspicious that Miller's reactions to the cigarette smoke were actually a Covid infection, ordered Covid tests and lung x-rays; on each occasion, Miller's results were negative.

24.    Miller was faced with a dilemma; how would he manage the smoking issue? Hall had just inferred that Miller could take pictures to provide her with evidence, but Miller had just spent thousands of dollars moving to Georgetown[6] and was the "new kid" on the block who wanted to have a good relationship with his neighbors, particularly since he was residing in a quadplex townhome, his front door, center-to-center, only 10-11 feet from Devers (166C), and 33 feet from Thomas (166B).[7]  **(Exh. D)**

25.    As it were, Miller had planned a trip out of State, which lasted from Jun 4, 2019, until August 4, 2019, giving Miller an opportunity to think things through and hope that things, upon his return, would be better.

---

[6] Which had been quite difficult on Miller physically, since he could not afford movers and, given that he has had a hip replacement and has systemic osteoarthritis, makes it difficult to move heavy items.
[7] According to Google Earth, and which Miller believes to be a good approximation.

26.     However, upon his return, Miller observed that there were many, many, more smokers than what he had initially realized, and in time, witnessed smoking from twenty-five (25) different households. **See Exhibit "E"**. Examples of such smoking are reflected in **Audio-Video Exhibits "F.1" through "F.9"**.

27.     Of these twenty-five (25) households, excepting one, all were female heads of household.

28.     Furthermore, the tension between Ross and Miller escalated, apparently the result of Miller's complaints about his poor maintenance, the most egregious[8] being his concealment that washing machine water valves had permanently seized up, causing a water drip, which Ross dealt with by cutting the hoses down to 2 feet, stuffing paper into them, and then placing them into the drain; Miller was completely unaware until he attempted to install new hoses in preparation of the delivery of a new washing machine, (**EXHIBIT "G.1" & "G.2"**). Thus began, what Miller considered to be, a pattern of Ross' stalking, harassing, and intimidating, him. Ross would follow Miller around the apartment complex, sometimes even yelling out at him, when Miller, for example, attempted to video record 1) an individual associated with apartment building 164 who frequently stood and smoked near Miller's apartment and, on several occasions, urinated there, or 2) the loud sound of the garbage dumpsters, when collected, which almost always occurred between 4:30 to 5:30 a.m[9], or 3) the barking of a neighborhood dog who would bark for hours at a time, repeatedly, at all hours of the day and night[10], or 4) neighbors abusing their dogs (and violating the lease) by leaving them out unattended for hours at a time, sometimes out in the rain or on leashes not even two feet long, or locked in cages so small that they couldn't move around, which often led to hours of barking[11]; or 5) the very large crowd of non-resident Blacks who had descended on S.O. after a shooting which involved a Black S.O. resident. And, when Miller approached

---

[8] Other than the poor work he had done prior to Miller's inspection of the apartment back in March 2019
[9] Miller had emailed Hall about Rumpke (garbage collectors) arriving in the early morning, but she refused to do anything. See **Exhibits "H.1" and "H.2"**. Miller, tired of being startled and awakened at or about 5 a.m. (**Video Exhibits "I.1" & "I.2"**), took it upon himself to gather evidence in the event he needed it (**Video Exhibits "J.1" and "J.2"**)
[10] Miller incorporates herein by reference, ¶13,with its Exhibits, of Miller's Affidavit in Support of Complaint
[11] See **Video Exhibits "K.1" & Video "K.2"**

management on April 20, 2020, attempting to point out what he believed to be a real-time drug

transaction playing out in the parking lot in front of the office and at 166B, Ross hovered and would not

leave, which drew attention to the potential perpetrators, who then aborted.  Additionally, when Miller,

on September 18, 2019, called Hall informing her of a group of smokers who were standing in the

parking lot right outside her office and that these individuals had frequently congregated in that area,

usually smoking, Hall directed Ross to talk to them, and as he did, he pointed over at Miller's apartment,

the smokers following suit.

29.     Based upon remarks by each of them at differing times, Devers and Ross had both been at S.O. for

five years and had developed a friendly relationship, in fact, Miller witnessed Devers gifting Ross a

lightly-used lawn mower, the paint still shiny-new and unblemished.

30.     Devers, who had initially been somewhat neighborly toward Miller, began giving him the cold

shoulder, and by Thanksgiving, all communication had ceased. Neither Devers nor her friends and family

made an effort to hide their smoking, and when she had a group of visitors over, the cigarette smoke

encroaching upon Miller's apartment, increased dramatically. See **Exhibit "L.1" and Audio-Video**

**Exhibits "L.2" & "L.3"**.  On Christmas day, 2019, a group of ten or so people were at Devers' apartment

and wandered about, openly smoking. See **Audio-Exhibit "M"**. Devers' sister would visit and smoke on

the walkway right in front of Devers' and Miller's doors, both Devers and her sister giggling and smirking

while glancing over toward Miller's front window as if to say, "fuck you, what are you going to do about

it!" Devers began 1) to routinely let her dog out to take a crap, leave it unattended, and laugh loudly if

she caught it crap near Miller's door[12], 2) allowing, and even encouraging, her dog to bark[13], 3) slamming

her front door like she had never done before, 4) banging on the walls[14], 5) and spreading false rumors

---

[12] See **Audio-Video Exhibit "N"**

[13] See **Audio-Video Exhibit "O"**

[14] See **Audio-Video Exhibit "P"** @ :0 and :38

among the neighbors, for example, that Miller had destroyed her flowerbed[15] (Miller incorporates herein by reference, **Miller's Affidavit  ¶12, with its Exhibits "3.1" & "3.2"**) and, furthermore, when Covid hit, Devers' disregarded Kentucky Governor Beshear's Executive Order dated March 19, 2020, which prohibited mass gatherings, and hosted multiple visitors, on multiple occasions, as did Thomas in apartment 166B.

31.     Thomas was equally as guilty as Devers in lease violations, but was the worst when it came to smoking. Virtually every time that Miller saw Thomas, she was smoking, and she, likewise, had numerous friends who would smoke on the property. See **Exhibits "Q.1" & "Q.2"**.  Thomas also owned a dog, which was not only over the weight limit as per the lease, but she would let it off the leash to run around wildly (see Exh. L.3., supra), or when it was on a leash, she left it unattended for hours, where it would whine, cry, and bark incessantly. See **Video Exhibit "R"**. In fact, a full blown physical altercation occurred resulting when the head of household at 148A Towson, complained to Thomas about the dog, and Thomas and her friends went up to 148A and started a fight. See  **Video Exhibit "S"**.

32.     On November 5, 2019, Miller, at his wits end, sent S.O. a scathing email entitled SMOKERS!!!, complaining about the continuing smoking situation and accusing S.O. of turning their backs and doing nothing; S.O.'s did not reply. See **Exhibit "T"**.

33.     Miller, having had enough of Hall's inaction, wrote a 13-page letter, dated February 13, 2020, to Alco Management Inc.'s corporate office, addressed to both Frank Z Jemison, Jr., CEO, ("Jemison") and Robert D. Hyde, President, ("Hyde"), describing the problems he had encountered during his relationship with the Company (see **Exhibit "U"**), and when, on March 16, 2020, Miller had received no reply, he sent a follow up letter to Jemison and Hyde, contending directly, that S.O. had defrauded him in representing that they were a non-smoking property, but that he hoped there could be an amicable solution; enclosed with such letter, was the video of a smoking individual with whom Ross was working,

---

[15] An allegation that she later made to Detective Lewis Crump of the Georgetown Police Department

on S.O. property, trying to repair a water line (**Video Exhibit "V.1"**), and a video of Ross, on S.O. property, talking with a smoking tenant yet doing nothing about it (**Video Exhibit "V.2"**), as well as video of tenants from apartments 166B, 152E, and 152F, outside and smoking.  Neither Jemison nor Hyde ever responded to any of the 3 written letters that Miller sent them, nor the several emails sent and voicemails left.

34.    On March 24, 2020, over a month after Miller's first correspondence with Jemison and Hyde, Miller received a letter from Beth Stolts, who identified herself as the Regional Senior Property Manager of Alco Management, Inc. In a nutshell, Stolts' used the Covid outbreak as an excuse for all the problems going on at S.O., further representing that S.O. had

> "addressed some of these issues with residents before and will continue to address any violation of the lease. In the meantime, we will send out **additional** {emp} correspondence to all residents with regards to the policy on inoperable vehicles, smoking on the property, excessive noise, and pets. We will do our best to monitor and address these issues during the interim period while looking for a new Community Manager."

35.    Miller considered Stolts' letter an insult to his intelligence, rife with excuses and simply meant to placate. For months prior to Covid and before Hall vacated her management position, things at S.O. were running amok. Smoking was rampant[16] and varying lease provisions were being ignored, such as Butler living with Thomas; Cordale living with Devers; Thomas owning a dog over the weight limit and letting it run free, as did Devers with hers; noise, including not only neighbors partying in other building, but Devers having loud and rambunctious friends and family over, banging on the walls, and also yelling through them; alcohol consumption in common areas; storage of inoperable vehicles; and particularly troubling, the leasing of 2-3 apartments to what appeared to be, gang-related individuals, who frequently had groups of visitors over who would take over the parking lot and even the street.  Furthermore, it was apparent that S.O.'s answer for any violation, was simply to send out another en masse notice while

---

[16] Miller incorporates herein by referance, his Affidavit in Support of Complaint, ¶9 and referenced Exh. C & D. This was not occasional, light smoking,

shaking their proverbial finger.  As time would show, S.O. did little to nothing, to rein in the numerous problems occurring on their property.

36.    Subsequent to Stolts' letter dated March 24, 2020, Miller communicated with S.O. at or about thirty (30) times regarding partying, smoking, noise, parents disregarding Governor Beshear's quarantine Executive Orders, repeated police presence, fights, and a shooting (**Exh. "X.1"** ) and in so doing, provided at or about sixty (60) additional videos in substantiation of his complaints. See **Exhibit "X.2"**.   Clearly, S.O.'s "monitoring", was nonexistent.

37.    When video-recording, Miller attempted to do so unnoticed, even at those times when Ross had seen him and followed him around; however, in April 2020, Miller was caught by Devers and Thomas as he attempted to video-record (from inside his upstairs front bedroom window), Thomas smoking as she walked by his apartment.

38.    Being incognito presented its difficulties in video recording, particularly when it came to Thomas because she so often walked by or near him as she smoked (Miller almost always recorded through partially open blinds or just above the windowsill, which is readily noticed in many of his videos); however, on April 3, 2020, Thomas and Butler presented a golden egg when they hosted a BBQ, had friends over, and sat outside smoking, not only cigarettes, but marijuana, and in the presence of neighbor child[17]. See. **Audio-Video Exh. "Y"**.

39.    As Miller collected evidence of smoking to be presented to S.O., he discovered that people were, at all hours of the day and night, going to and from Thomas' apartment[18], staying only several minutes, and then leaving. For example, on at least three occasions, a vehicle would park at the end of the parking lot or out in the street, and a female would walk to the apartment, leaving after only five to ten minutes, and then return to the awaiting vehicle. Miller observed this type activity for several weeks and

---

[17] The Black male wearing red is the individual that Crump would later state was "indeed, selling drugs."
[18] Where Butler, a convicted felon, was living unlawfully, since Thomas, a recipient of a HUD HCV and Butler, did not report him as a household member; furthermore, Butler was not on the lease.

in a letter dated May 7, 2020, addressed to Chief Bosse of the Georgetown Police Department, Miller described what he had seen and provided samples of the video-recordings capturing such activity, one of which was the unedited video of Butler's BBQ, seen at Exhibit Y, supra.

40.    On about May 27, 2020, Miller received a phone call from Detective Lewis Crump ("Crump") to discuss Miller's letter to Chief Bosse.  Crump indicated that Thomas and Butler would be watched.

41.    For a year, Miller had avoided direct contact with Devers and Thomas regarding their incessant cigarette smoking and other lease violations, choosing instead to avoid direct conflict by informing S.O. about it; however, given S.O.'s repeated and continuous inaction, Miller composed, and mailed, a letter addressed to both Devers and Thomas, dated May 2, 2020, entitled in bold, capitalized., large font, **"THIS IS AN ATTEMPT TO AVOID LEGAL ACTION"**.  In summary, Miller informed them 1) of his allergies to cigarette smoke and how it impacted his health, and that 2) Miller's physician had on two separate occasions tested Miller for Covid, concerned by the severity of Miller's the respiratory distress, 3) it was apparent by their blatant disregard of the contract that they believed 166 Fairfax Way was their own personal "kingdom", 4) it was obvious that they were intentionally attempting to force Miller to move, and 5) he was concerned about his safety. Miller conveyed that he hoped for the best possible outcome, which would be for them to cease smoking, but that if they did not, he would and he would sue, if necessary, to protect his Consitutionally protected property interest. Furthermore, Miller informed them that

> "[i]f you think you're going to force me out of here so that you can carryon with your little 166 Fairfax Way "EMPIRE", which includes not only the incessant smoking inside, but also **166B's home business** {emp}, you're sadly mistaken."

42.    Miller didn't need to check the U.S. Postal Service's tracking to know that Devers had received her letter as she began repeatedly yelling at Miller through the wall, calling him a "fucking dumb ass", banging on the wall, and slamming her front door as a flury of activity ensued, with Thomas and Devers repeatedly going back and forth between each others' apartment. Later that evening, as Miller stood in his kitchen,

he heard, without the utilization of any amplifying hearing device, Thomas and Devers talking in Devers kitchen, discussing how they were going to get even with Miller, and as time would tell, they were true to their word.

43. On June 30, 2020, as Miller was going to get his mail, Butler began yelling to get Miller's attention. Miller ignored him, gathered his mail, and attempted to avoid him, but Butler began walking toward him. Butler then accused Miller of telling neighbors that he was selling drugs[19] and that if Miller did that again, "it's on." When Miller responded, "that sounds like a threat," Butler responded, "it's not a threat, it's a promise;" Miller proceeded into his apartment and immediately called the Georgetown Police[20].

44. When Officer Bill Denton responded, Miller informed him that Butler had just threatened him and that Miller had previously spoken to Det. Crump about Butler's possible drug trafficking. Officer Denton told Miller that he would contact Crump, as this might be an issue of intimidating a witness; Miller's conversation with Denton was short, lasting only about 4 minutes. As Miller was walking away, Butler aggressively called out to Denton about "this mother fucker," referring to Miller. Miller never heard a single word from the GPD about this threat or any of Miller's other conveyances that he felt afraid.

45. Miller's Initial Lease expiration date was May 31, 2020. Because S.O. receives low income housing credits, tenants are required to be "recertified" annually, a process which determines a tenant's qualifications, which then determines the property's qualifications to receive Federal tax credits. Given all the problems Miller encountered, a reasonable mind might scream, "get the hell out!", however, Miller was stuck between a rock and a hard place. Miller, who is on social security disability, is impoverished and is classifed as such by the Federal Government. Not only had Miller depleted several thousand dollars of his limited savings when he moved to Georgetown, and hundreds of dollars attempting to make his

---

[19] Apparently referring to Miller's May 2, 2020, letter referencing "166B's home business"
[20] Miller would later learn that Butler is a repeat offender, whose felony crimes included assault (maybe battery), domestic violence, and robbery of a Dominos Pizza, just to name a few. Almost all of these crimes, except for the ones for which he is currently incarcerated, were commited in Georgetown.

apartment a home[21], but Covid had brought Housing Authorities and Lessors to a screeching halt; particularly because of eviction moritoriums keeping people in their apartments and stay-at-home policies, closing of many housing authorities across the Country. Furthermore, Miller was continuing to communicate with S.O., in hopes of coming to an amicable and satisfactory resolution. See **Exhibit "Z"**.

46.     On or about April 1, 2020, Miller found taped to his door, an envelope from S.O., containing what appeared to be a "canned" cover letter upon which was hand-written, a request for a social security verification letter and bank account verification information. Perusing the first[i] paragraph of such cover letter, Miller noticed the date of May 1, 2020, and believed that was their due date. Subsequently, Miller received another copy of the April 1, 2020, cover letter, with additional hand-written notes, informing him when someone would be available in the office.[22] Upon receipt of this second copy of the cover letter, Miller realized that S.O. was requesting return of his Social Security verification letter and banking information, prior to May 1, 2020; on April 23, 2020, Miller attended the S.O. office with requested documents, as well as a cover letter apologizing for his oversight. Miller requested that S.O. acknowledge receipt of Miller's documentation, which manager Cynthia Gullett did, without saying anything about the need for additional recertification documentation. (**Exhibits "AA.1", "AA.2"** and **Audio-Exhibit "AA.3"**)

47.     On April 28, 2020, Miller received notice from S.O., that his renewal lease was ready for signature, however, because Miller was Covid quarantined, Miller requested that the renewal lease ("Renewal Lease") be left at his apartment, and on May 1, 2020, S.O. left a large packet at Miller's front door; at no time whatsoever, did S.O. alert Miller that such packet included additional recertification documents, so Miller had no reason to believe that all the packet's documentation was anything but the Renewal Lease

---

[21] Though 2 bedrooms, they were very small. Although S.O. represents them to be 769 sq. ft., Miller determined, when he measured it out, that because of its layout, e.g. placement of doors, that the actual usable floor space is only at or about, 500 sq. ft; furthemore, S.O. includes the stairway in its square footage computation. Additionally, the kitchen had one single drawer, no base cabinet storage, and only 1 full-size wall cabinet. Two other standard height wall cabinets were only 10 inches wide, and another 2 were small, over the stove and sink cabinets; Miller was in desparate need of kitchen storage, so he had to buy it or build it.

[22] Because of Covid, access to the S.O. office was available, only by appointment.

or attachments thereto, and as previously stated, at no time, did S.O, otherwise, notify Miller that there was additional recertification documentation outstanding. When viewing the Renewal Lease, Miller immediately observed that the renewal date began May 1, 2020, overlapping with his Initial Lease by a month; Miller also noted that the Renewal Lease reflected that he would have to pay for natural gas, which had been included in his Initial Lease, and that it did not include the required HUD addendum. Given these discrepancies, Miller would not sign as is, and remained in the apartment under the Initial Lease, as he sought corrections to the Renewal Lease and assurances from Jemison and/or Hyde that S.O. would take action with all the lease violators.

48.    On May 4, 2020, when Miller called the office to pay his rent, the issue of his Renewal Lease came up. Miller explained the overlap of the Initial and Renewal lease terms, but the employee insisted that was not possible; wanting to avoid, when Miller explained that he would just talk to Stolts about it, the employee stated, "I don't understand why you want to be difficult, just sign the papers and bring them in here", without another word, Miller terminated the call. (**Audio-Video Exhibit "AB"** @ 9:23).

49.    With the month of May 2020 coming to an end and S.O. refusing to modify the Renewal Lease, Miller notified S.O. that he would like to be present for the move-out inspection; however, in the interim, Miller learned from the GHA, that S.O. had failed to comply with HUD law and HAP contract provisions which required that they give a one month notice of lease termination. GHA informed Miller that they had already issued payment to S.O. for June 2020, and with that knowledge, Miller rescinded his notice to move.  Although Miller's Initial Lease expiration date was May 31, 2020, provisions of that contract provided that absent a signed renewal, the terms would become month-to-month, upon which Miller relied, notifying S.O. of such.

50.    On June 25, 2020, Miller received a letter from Richard M. Rawdon, Jr., which stated that Alco Management, Inc. had given him permission to issue Miller a Notice to Vacate and that Miller had 30 days in which to vacate the premises or face eviction. Rawdon claimed that 1) Miller's Initial Lease had expired

May 31, 2020, 2) Miller failed to submit or sign required recertification papers, and 3) that Miller had previously notified S.O. that he would be vacating his apartment on May 31, 2020. Rawdon further notified Miller that he had a **right** {emp} to discuss this matter with "Management" within ten (10) days[23], by calling the S.O. office, which Miller did, however, Alco Management refused to meet with him.

51.    On or about July 4, 2020, Miller found littered on the ground, a letter on S.O. letterhead, dated June 1, 2020, addressed to Michael Glover, informing him that his annual recertification had been due **January 1, 2020** {emp}, five months prior to June 1st, and that he needed to come into the office to immediately handle the matter. **Exhibit "AC".**

52.    Miller considered resisting the Notice to Vacate, but upon learning that Kentucky state courts are "pro landlord", and "would know little to nothing about Miller's Federal rights and wouldn't care otherwise", Miller moved out on July 24, 2020, but not by free will.

53.    On July 27, 2020, GHA denied Miller renewal of his HCV, GHA explaining to him that he was under investigation by the Georgetown Police Department and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and that as long as such investigation continued, they would deny Miller's HCV.

54.    Immediately, upon termination of his visit to the GHA, Miller called the ATF office in Lexington and left a voice mail message identifing himself and explaining what had just happened at the GHA; Miller also called and left a voice mail message with Crump and, explaining what had just happened at GHA, informed Crump that he was available to come in and talk. As to the voice mails left for Crump, Miller **incorporates herein by reference, ¶6 of his Miller's Affidavit and exhibit A.1 and audio-video exhibit 1.1 and 1.2,** attached thereto.

55.    The next day, Miller talked to ATF Special Agent Sabrina Hager ("Hager") [**Miller incorporates herein by reference, ¶7 of Miller's Affidavit, including audio-exhibit 2**]. Hager repeatedly expressed to Miller

---

[23] Although the Initial Lease provided for 10 days, that claus was based upon HUD law, which actually required that Miller have 14 days in which to request the meeting. HUD 4350.3.

that he was not under any ATF investigation, and that she was assisting Crump, as she sometimes did when the Georgetown police department was short-handed. Hager made statements such as, e.g., "don't be concerned whatsoever" (audio @ :56 seconds), ATF not involved, just trying to help Crump (@2:05 and @18:33), "I have no reason to investigate you" (audio @ 13:18 minutes), and "you and I are good, sir" (@19:58); similar intimations were expressed at 3:40, 6:45, 8:25, and 19:28 minutes. Though stating that she had done what she had to do, Hager said that she did not know where Crump was in his investigation of Miller.

56.    On or about August 12, 2020, Miller received a phone call from Crump [**incorporated herein by reference is Miller's Affidavit ¶6, exhibit A.2, and audio-video exhibit 1.3**], who presented quite a different story from that of Hager, stating that Miller had been under investigation by the ATF and that Hager had let Miller off with a warning for impersonating a Federal agent (Aff. exh. 1.3 @ 9:53). Crump informed Miller that he had been under investigation because Devers "feels like" she's being harassed (Aff. exh. 1.3 @ :54). Crump then informed Miller that he was not to have either direct or indirect contact with Devers, which would include **making anymore complaints to the office** {emp} (Aff. exh @ :54, 1:36). When Miller stated that it was the other way around and that Devers, at times in conspiracy with Thomas, had done the harassing, deliberately trying to force Miller to move, Crump remained silent (Aff. Exh. @ 2:17, 2:41). Miller further stated that it was interesting how Miller had been the victim and now it was being turned around on him, even pointing out that Miller had informed Crump himself, that he feared for his safety (Aff. Exh. @ 5:21, 5:30). When Crump then alleged that he had tried to contact Miller "a couple of times", but failed, Miller challenged him with, "you had my phone number, but never left a message"[24] and "you had my email address"; Crump responded that since Miller was being investigated by the ATF for impersonating a Federal Agent, Hager had instructed him not to email Miller (Aff. Exh. @

---

[24] Crump then alleges he didn't have Miller's phone number until Miller left it in his voice mails on July 27, 2020, however, Crump states in his Case Report, that he left a message for Miller on June 30, 2020, which Miler never received, and that he got Miller's phone number from Southern Oaks on July 8, 2020.

7:59). Again, Miller challenged him by asking, where would they get the idea that Miller, Crump responded, "you sent a letter to the Chief of Police, right?", "you said, 'I am a **formal** employee of the Federal government. (Aff. Exh. @ 11:12)

57.   On July 28, 2022, Miller obtained a copy of Crump's investigative report ("Crump Report"), [**incorporated** herein by reference, **Miller's Affidavit ¶10 and supporting exhibits**], and finding numerous mistatements and omissions, Miller obtained from the court clerk on July 29, 2022, Crump's "**Affidavit For Search Warrant**" {emp} (hereinafter, "Crump's Aff.") and the resulting "**Search Warrant**" {emp}.

58.   From Crump's Report, Miller learned that Crump did not close the case until August 12, 2020, and that such report contained (54) paragraphs; ¶¶ 1-14 relevant to Miller's May 7th Letter to the Georgetown Chief of Police, ¶¶ 15-17 relevant to Defendant Butler's threat to Miller, and the remaining paragraphs relevant to Crump's allegation that Miller had "formally" represented himself as a current employee of the Federal Government, as well as allegations made by Devers and Thomas that Miller had harassed them in his May 2, 2020, letter to them (see Complaint ¶47, supra). Readily apparent from Crump's Report was that Crump had predetermined that Miller was holding himself out as a currently employed Federal Agent, despite Crump's periodic acknowledgement that Miller had stated he was "formerly" an employee (See Crump's Report ¶¶ 2, 4, 54). Crump's state of mind and intentions were further evidenced, when in Crump's Aff., he three (3) times either stated "**prior** federal agent", or "**prior** law enforcement or federal employee", or "Miller has claimed to **have been** a federal agent," before then proceding to state in his second to the last paragraph, well within the immediate view of the District Court Judge, that he "believes Miller [is] impersonating a Peace Officer" (See Aff. ¶11, Exh. "F", ¶¶ 2, 6, 8, 13).

59.   Crump's Report is frequently incohesive, at times making it hard to follow, and contains a number of factual inacuracies (as set forth more fully in Miller's Aff, ¶10). For example,

> a.   Miller never alleged Dever's to be participating in drug activity (Crump's Report ¶5)
> b.   Miller never alleged that a small package slipped through a window was, in fact, heroin (Crump's Report ¶8)

    c.  Miller never alleged that Butler (the ex-con living with Thomas) was not participating in court ordered anger management (Crump's Report ¶17)[25]

    d.  Miller's apartment windows at Southern Oaks were not tinted (Crump's report ¶19)

Particularly interesting, is Crump's repeated reference to Devers as the "elderly female", a woman Miller's junior, which Crump intentionally uses for the purpose of painting a picture of the poor helpless woman; Crump's alliance with, and reliance on, Ross, with whom Miller had had, numerous problems; Crump's exploitation of S.O., with whom Miller had had, a 14 month long contractual conflict; and Crump's absolute disregard of Miller's repeated reporting to him, that he feared for his safety, which he believed would come at the hand of Thomas and/or Devers (Crump's Report ¶¶ 2, 4, 5, 14, 15-17, 31).  Miller takes issue with the accuracy of other statements made in Crump's Report, as is reflect in Miller's Affidavit, and other issues which Miller intends to address during further proceedings.

60.   **Crump's Affidavit** {emp} reiterates many of his allegations in Crump's Report; however, he embellishes, e.g., in paragraph 13 under "Affiants Investigation", Crump further alleges that Miller is "**harassing the residents at building # 166 through the management ...**" {emp}.

61.   Miller, responding to what he had learned from those Crump's Report and Crump's Affidavit, July 27 - August 3, 2022, respectively, researched Federal and State government policies in effect at the time he had received his Notice to Vacate (¶56, supra.) and learned that S.O., as the recipient of "low income housing tax credits", was subject to the polices of Kentucky Housing Corporation ("KHC"), which had issued guidance stating that they "will allow delayed recertification for all tenants at this time". **Exhibit "AD", page 2, para. 1a.**

62.   Prior to his receipt of Crump's Report and Crump's Affidavit, Miller had no idea that the Head of Household of 166A or S.O., were involved in Crump's investigation of Miller. As it were, Miller was the only non-smoker living in the quadplex building 166, Fairfax Way, 40324, and had complained to S.O.

---

[25] Miller notes that in Crump's Report, he carefully avoids writing "Anthony Butler", an idividual that he knew, or should have known, was a repeat offender, such ommission perhaps intentional, as it would, or should, have raised questions about the credibility of witness statements regarding Miller's alleged harassment.

about 166A's smoking and partying (exhibit F.5, supra.), but Miller only had direct contact with them twice, once when he approached them in the parking lot while they smoked, asking them to stop smoking, at least, in the apartment, and the other time when he placed a note on their door when they refused to stop smoking, to let them know that Miller was going to include him in his lawsuit against Devers, Thomas, and S.O.

63.     Miller incorporates herein by reference, Miller's Affidavit, ¶13. Miller's homelessness resulting from the ruthless, cruel, and malicious actions of Defendants, caused him tremendous anguish and hardship.

***Policies, Procedures, & Practice of the GPD***

64.     The Georgetown Police Department ("GPD") follows the accreditation standards set by the Kentucky Association of Chiefs of Police, in addition to the training provided by the Kentucky Law Enforcement Council.

65.     Upon information and belief, the GPD has written internal policies and protocols, seemingly to effectuate proper investigative skill/techniques and continuing professional education requirements regarding not only those skills/techniques, but the laws of the State of Kentucky.

66.     Said written directives should govern the training of policemen conducting investigations, such as, in identifying, testing, and verifying the veracity of statements made and evidence provided by witnesses, particularly when, e.g., dealing with suspected drug traffickers and their friends and associates, and especially when such suspected trafficker, is known to have a long criminal history.

67.     The Georgetown Police Department also has Standard Operating Procedures governing training and critical training procedures for its officers.

68.     On information and belief, the GPD's training and policies failed to provide adequate training to officers in investigative techniques, including proper protocol and procedure in how to deal with undue enfluence from personally connected individuals, such as the officer's family, friends of family, or other associations, while conducting a police investigation.

69.    As a result of this failure there is a pattern of GPD officers, exercising shoddy and incomplete investigations, either from the 1) misinterpretation of criminal laws and/or 2) the officer's failure to diligently conduct investigations, at times deliberately and with bad intent, for the purpose of coercing and intimidating citizens.

70.    The conduct of the Georgetown Police Department officer during the incident in question as well as past cases worked by the Georgetown Police Department, have shown that the GDP routinely exercises unlawful threats and coercion during the exercise of their official duties.

71.    Upon information and belief, the Georgetown Police Department has not adequately trained its officers despite its knowledge of its officers' poor investigative skills. The GDP has acted with deliberate indifference in failing to properly train its agents and officers, impliedly approving of the use of poor investigative skills, misinterpretation of laws, and coercion and harasment of innocent citizens, in the Commission of police duties.

72.    If the GPD had adequately trained Crump in proper investigation skills, Crump would not have fraudulently represented to the ATF that Miller was representing himself to be a Federal Agent; learned that the allegations made by Judy K Devers were not supported by the evidence and were simply part of a premeditated conspiracy between her and Thomas to oust Miller from the property; purposefully and deliberately misrepresented the law for the purposes of harassing Miller with unlawful threats of arrest; allowed himself to become aligned with suspected drug dealers, including the repeat offender, Butler; or conspire with Southern Oaks in violation of Miller's rights as protected by the Federal Fair Housing Act.

## CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF - Violation of the Fair Housing Act**
*CRUMP, STOLTS, GULLETT, HYDE, JEMISON* (in all his capacities) *and DEVERS & ALCO COMPANIES*

### Collusion

73.    Miller incorporates herein by reference, paragraphs 12-72.

74.    Miller brings this claim pursuant to 42 USC 1983 for violation of 42 USC ¶¶ 3604(b) and 3617, against Crump, who acting under color of law, colluded with Stolts, Gullett, Hyde, Jemison, and the Alco Companies, who, by use of coercion, intimidation, and threats, interfered with Miller's rights to be free of sexual and disability discrimination. As inferred by 42 USC ¶ 3614, Congress did not intend that persons acting under color of law, are immune from the FHA.

75.    As a detective of the Georgetown Police, Crump knew, or should have known, the laws of the land, including, but limited to, the Federal Fair Housing Act, Kentucky Fair Housing Act, Kentucky Uniform Residential Landlord and Tenant Act, and KRS §§ 525.070 and 525.080.

76.    By building a bogus investigaton on baseless and unsupported claims of impersonation and harassment, Crump intentionally and purposefully, shielded these other defendants from Miller's complaints that they were, and had been, violating his rights not only pursuant to the Initial Lease, but also his Constitutional rights as set forth in the FHA and *Goldberg, supra.*

77.    Crump had an agenda, and by hook or **crook,** was going to twist and fabricate the facts and law, by any means, to develope, mold, and create, charges against Miller for 1) impersonating a Federal Agent for the purpose of undue influence, despite clear and convincing evidence in Miller's May 2, 2020, letter to the GPD, and elsewhere, that Miller only ever alleged to have been a **"former"**{emp} Federal employee, and never stated that he is a **"formal"** {emp} Federal employee and 2) harassing his co-tenants based upon a single written communication to 166A, Thomas, and Devers, in which Miller was hoping to bring to action, the cessation of their varioius lease violations, particularly smoking.  Upon receipt of Crump's Affidavit (July 28, 2022), Miller learned for the first time, that Crump had also alleged that complaints made by Miller to S.O. about Thomas', Devers', and 166A's lease violations, was "harrassment."[26]

---

[26] Crump said nothing about this in his conversation with Miller on August 12, 2020.

78.    Despite acknowledging in Crump's Report that Miller had expressed ongoing problems with his

neighbors, Crump ignored these facts, as that would have hindered the development of his ficticious

claims. He did not consider whether Miller's accusers were forthright and credible, and ignored, e.g.

Butler's long history of arrests and prosecution, and Thomas' search for Boosters[27], because "we need

sum stuff"; or even the letter from Devers' and Thomas' own attorney, David Higdon, which stated,

"that although you do not believe the contents are threatening ...". Furthermore, Crump dropped his

investigation into Thomas and Butler for potential drug trafficking and aligned himself with them in

pursuit of finding some evidence in which he could criminally charge Miller.

79.    Hoping to "bust" Miller, Crump solicited the ATF for assistance, attempting to prove that Miller

had committed the crime of impersonating a "Peace Officer", and with that assistance, appeared at the

offices of both S.O. and GHA, soliciting information that he hoped he could manipulate into "substantive

substantiation" supporting his bogus claims; as the result of Crump's appearance at GHA, GHA froze

renewal of Miller's HCV[28].

80.    Despite ATF Special Agent Sabrina Hager's words to the contrary, Crump alleged that the ATF had

determined that Miller was, or had been, holding himself out as a Federal Agent, and consequently, he

was given a warning, Miller incorporates herein by reference, Miller's Affidavit, ¶¶ 6 and 7, and the

Exhibits attached thereto. Though never asking Miller if he could substantiate his past employment with

the Federal Government, Crump, in his Application for Search Warrant (Crump's Affidavit"), falsely

avered that, "This Detective learned Mr. Miller was not a federal agent, DOJ attorney or prior law

enforement", despite having absolutely NOTHING in Crump's Report or Case File that supported his

assertion that he been told any of those things he alleges the ATF told him. Miller incorporates herein by

reference, Miller's Affidavit, ¶15.

---

[27] Defined by Merriam-Webster, as a "shoplifter"
[28] In assistance to the Court, as a refresher, Housing Choice Voucher

81.     Crump, utilizing lies, including lies by omission, aligned himself with the Alco Companies and their employees , Stolts, and Gullett, who not only demonized Miller by making false and misleading statements about him, but provided documents to Crump, prior to his receipt of a Search Warrant. Crump, utilizing lies, including lies by omission, Petitioned the court for a Search Warrant, and upon receipt, served it upon S.O., who submitted over 100 pages of documentation, many of which he had already seen or obtained copies of.

82.     Though having no evidence that Miller had held himself as a Federal Agent, Crump falsely asserted that Miller had been warned by the ATF; though unsupported by KRS §§ 525.070 and 525.080 or the facts, Crump warned Miller that he would be arrested for harassment if he had any further contact with Devers, directly or indirectly, which would include any complaints to Gullett, Stolts, or the Alco Companies. Regarding her lease violations.

83.     On August 12, 2020, Crump issued Miller a verbal Tresspass Notice, pursuant to the request of Stolts, who falsely claimed that Miller had returned to S.O. property after he vacated his apartment, and was seen taking pictures of, and video-recordings, tenants.

84.     The Alco Companies and their employees , Stolts, and Gullett,  knew that their discriminatory actions would not withstand legal scrutiny, and Thomas and Devers knew that they could face legal action, because Miller had said as much in his May 2, 2020 letter, so they aligned themselves with the Alco Companies and their employees, Stolts, and Gullett , and utilizing their various personal connections, drew into the array, a willing Crump, who, by abuse of power, lied about, coerced, harassed, and intimidated Miller, to create a fear in him, such that he'd be dissuaded from taking legal action against them for violation of 42 USC Chap. 45, and *Goldberg v. Kelly, supra.* (@ Nature of the Claim).

85.     Miller includes herein by reference, his Claims 2, 3, 4, and the allegations therein, not yet alleged in this First Claim for Relief.

86.   Crump's bogus investigation of Miller, and the effects it ultimately had upon him, served no legitimate purpose and was merely meant to scare Miller such as to interfere with his rights pursuant to the FHA and ADA.

87.   In all his actions, Crump either followed GDP Policies and Procedures, which permitted his diabolical actions; or alternatively, engaged in unspoken, unlawful practices, which were known to exist by his superiors, who simply looked the other way.

88.   On August 3, 2022, Miller learned for the first time, that Devers, in an continuance of her efforts to remove Miller from his Constitutionally protected property interest right, had submitted three "notes" to Southern Oaks Apartments, and potentially Crump, all of which contained false accusations about Miller. Though Devers had, throughout Miller's tenancy, been one of the two individuals primarily responsible for violating his rights, she then became a willing participant in further violating his rights, when she submitted these faudulent documents with the intent of interfering with Miller 42 USC Chap. 45 rights, by participating in the cover up of the sexual and disability discrimination against Miller.

**Sexual Discrimination**
*ALCO COMPANIES, GULLETT, HALL, & STOLTS*
*(Jointly and Severally, and Against Stolts, in all Capacities)*

89.   Miller incorporates herein by reference, paragraphs 73 – 88.

90.   Thomas and Devers, as well as, Stolts, Hall Gullett, and every manager during Miller's tenancy and beyond, is female, as were the twenty-five (25) households Miller observed smoking.  Of these twenty-five (25) households, Thomas, 166A, and Devers had, as smoking tenants residing in the same building as Miller (a building having a single, common attic), had the most direct impact on Miller's health, safety, and general welfare; furthermore, because of Miller's complaints to S.O. about their persistent lease violations, complaints that were leaked to them by Gullett and Ross, Thomas and Devers, acting in

collusion, began a campaign of unlawful and lease violating activities,[29] designed to run Miller out of his apartment.

91.    Over a 14-month period, despite at or about forty (40) communications regarding the lease violations of his female neighbors that interfere with Miller's Constitutionaly protcted property interest rights, Gullett, Hall, Stolts, and the Alco Companies, continually and repeatedly ignored Miller's grievances about those individuals who were violating lease terms and provisions, particularly with regard to the non-smoking, and in so doing, knowingly, willingly, and with deliberate intent, protected these violators, simply because of their female gender. Neither Hall, Gullett, Stolts, nor the Alco Companies cared about the impact of Thomas', Devers'and 166A's chronic and habitual second-hand smoke on Miller's health and well-being, or their merciless harassment of him; they did not care that Devers' grandson was living with her, or that Thomas ex-con boyfriend Anthony Butler was living with her; they did not care that Thomas' boyfriend threatened Miller with bodily harm; they did not care about all the partying, yelling, and fighting going on at these female households; they did not care about all the female heads of household ignoring quarantine orders, or all the other lease violating activity going on; their only concern was to protect these females who were violating the lease and to hell with Miller.

92.    And Stolts', Gullett's, and the Alco Companies discriminatory acts did not stop with Miller's move-out, as Miller would learn on July 27, 2022, in preparing to file suit against Crump. Miller learned for the first time, on July 27, 2022, that Devers had submitted 3 hand-written letters to S.O., alleging that Miller 1) had pulled up flowers in her flowerbed, 2) was habitually smoking marijuana in his apartment, 3) stomped on the stairs as he goes up and down, 4) slammed his door, 5) flipped her off, and 6) was walking around video-recording and taking pictures of residents; Devers further alleged that she had heard Miller "cuss" the maintenance man a "couple of times" and "even the people ... who put up a new

---

[29] Pursuant to the Fair Housing Act, and otherwise.

fence". Although Miller was unaware of this at the time, S.O. was. On July 27, 2022, and August 3, 2022, Miller also learned for the very first time, that 1) Gullett had provided to Crump, prior to being served with Crump's Warrant, Miller's PPI, and alleged that Miller had sent "nasty emails", which is why he was evicted, and 2) Stolts had contacted Crump, requesting a No Tresspass Notice, because Miller had been seen on S.O. property, video-recording tenants. As to Devers "letters" Miller has denied her accusations in his attached Affidavit

93. As a recipient of HUD HCV, Miller had a constitutionally recognized, protectable property interest in his rental unit. Alco Partners, or one of the other Alco entities acting on its behalf, is provided, in whole or in part, with the aid of loans, advances, grants, and/or contributions from the Federal Government, and as such, pursuant to 42 USC 3603, is subject to the Fair Housing Act as set forth in 42 USC Chap. 45. The Alco Companies, Gullett, and Stolts, based only on Miller's sex/gender, discriminated against him in the terms, conditions, and privileges of his rental and the services and facilities in connection with his rental and in so doing violated the provisions of the Fair Housing Act, 42 USC §§3604(b) and 3617.

**Disability Discrimination**
*ALCO PROPERTIES, JEMISON, HYDE, GULLETT, AND STOLTS*
(Jointly and Severally, and as to these individuals, in all capacities)

94. Miller Incorporates herein by reference, paragraphs 89 - 93

95. Devers, Thomas, 166A, Hall, Stolts, Gullett and the Alco Companies, knew that smoking was not permitted anywhere on S.O. property and that Miller had a medical condition that was exacerbated by cigarette and cigar smoke; they also knew that smoking was rampant on S.O. property. Despite the No Smoking Policy, S.O. tolerated and ignored the violations, and therefore, smokers had no fear of openly smoking on S.O. property. Miller observed smoking at 25 households which is at or about, 80 percent of the S.O. apartment units.

96.     Contrary to the beliefs of Devers, Thomas, 166A, Hall, Stolts, Gullett, Jemison, Hyde, and the Alco

Companies, as well as, all the smokers at S.O., smoking is not a protected class, but Miller is.

97.     Hall, Stolts, Gullett, Jemison, Hyde, and the Alco Companies discriminated against Miller in favor

of the smokers and it the terms, conditions, and privileges of his rental and the services and facilities in

connection with his rental and in so doing violated the provisions of the Fair Housing Act, 42 USC sec.

3604 and 3617.

## SECOND CLAIM FOR RELIEF - Violation of Equal Protection Claus
### LEWIS CRUMP
### (in all his capacities)

98.     Plaintiff incorporates herein by reference, paragraphs 94 – 97.

99.     Crump unequally applied the Law, treating Miller differently than all the other Defendants,

thereby violating the Equal Protection Clause of the 14th Amendment. Miller had, on multiple occasions,

expressed a fear for his safety, which Crump ignored and disregarded, and when Butler actually

threatened him, a violation of KRS § 525.080, Crump again, did nothing; yet, when Devers and Thomas

complained about the letter Miller had sent them regarding their habitual lease violations and the

threat of litigation if they did not cease, Crump immediately jumped to investigating Miller for

harassement. Likewise, when Miller informed Crump that he had overheard Thomas and Devers

scheming to retalitate against him for his May 2, 2020, letter, Crump did nothing. And again, when

Miller informed Crump that Thomas and Devers were purposefully trying to drive Miller out of his

apartment, pointing out their various actions and the many complaints that Miller had voiced to S.O.,

Crump was unmoved. Even with the knowledge of Miller's medical condition and the impact that

smoking was having on his health, and Miller contending wanton or negligent endangerment, Crump did

nothing.

100.  Even after Miller had provided Crump with video evidence that Devers had falsely accused him of pulling up her flowers, Crump did nothing; and when Miller requested that Devers be given the same kind of notice regarding harassment as Miller had received, Crump was silent.

101.  Crump had obtained verbal statements and documents from Devers, Thomas, 166A, S.O. and Miller, showing that for over a year, 166A, Thomas, and Devers had harassed Miller with their smoking, loud noise, and various other lease violations, which not only violated Kentucky's harassment statute, but also 42 USC §§3604 and 3617, including Miller's right to quiet enjoyment, yet, as they say, "crickets".

**THIRD CLAIM FOR RELIEF - Unreasonable Search and Seizure**
*LEWIS CRUMP*
(in all his capacities)

102.  Miller incorporates herein by reference, paragraphs 98 – 101.

103.  Crump violated Miller's 4th Amendment Rights.

104.  Crump lied to obtain his Warrant and without such lies, all other statements made by him in his Affidavit for Search Warrant ("Crump's Affidavit"), when presented alone, presented no reasonable and probable grounds.

105.  Crump had no probable cause to seek a Search Warrant[30].  In his May 7, 2020 letter to the GPD, Miller clearly stated that he was a **"former"** [emp] federal employee, not "formal" Federal employee. Not a single witness interviewed by Crump, alleged that Miller had held himself out as a current Federal employee, and Crump flatout lied when he represented that ATF Agent Hager had issued Miller an official warning for impersonating a Federal Agent, as he did in his Warrant Affidavit, when he represented to the court that Agent Hager had informed him that "Miller was not a federal agent, DOJ Attorney, or prior law enforcement." Nowhere in Crump's Report or Case File does there exist a single document, including but not limited to, letters, notes, emails, audio or video recordings, substantiating Crumps's claims as to the alleged ATF representations, and furthermore, Miller has first-hand knowledge

---

[30] Especially, since Gullett had provided documents to him, for his viewing, prior to his receipt of a Warrant.

that the Office of Personnel Management has records of his prior Federal employment, and therefore, Miller knows that ATF Agent Hager could not have made such a claim. Additionally, because Crump had viewed documents in the hands of S.O. prior to receipt of his Warrant, such as information from Miller's credit report, Crump knew, that uninterested 3rd parties had long reflected Miller's employment as "U.S. Treasury". Furthermore, in his Warrant Affidavit, Crump, in four different paragraphs, stated, "he was a prior federal agent", and "claimed to have been" and "prior federal employee" and "prior law enforcement", before conspicuously stating right above the Judge's signature line, "This Detective believes that Mr. R. Miller is ... impersonating a Peace Officer".

106. As for Crump's claim that Miller was harassing his neighbors, Crump clearly and purposefully, ignored the law. Miller sent one letter to both Thomas and Devers regarding1) his fear that they intended to cause him bodily harm, 2) their continued lease violations, particularly their smoking, and 3) the potential for litigation if they continued those violations, and left a single note on the front door of 166A (but only after they rejected his verbal request to quit smoking), yet Crump alleged, both explicitly and implicitly, that Miller had sent multiple written communications to 166A, Thomas, and Devers, going so far as to characterize Miller's legitimate complaints to S.O. regarding their smoking and other lease violations as, "harassing".

107. Additionally, Crump lied by omission in failing to communicate that Miller's single letter to Thomas and Devers, clearly reflected, in bold and large type, **"THIS IS AN ATTEMPT TO AVOID LEGAL ACTION"**; and that any references made by Miller regarding his family, friends, or former colleagues, was in the context of Miller's fear for his safety at the hands of Thomas, Butler, Devers, and/or their various connections, particularly after Devers' grandson, Cordell Devers, had been lurking around Miller's front window and had at one time and for no apparent reason, approached Miller and told him, "watch out for these kids around here, they go around shooting people"; and that Miller was acting to protect his Constitutionally protected property interest right; and that the great weight of Miller's May 2, 2020,

letter, regarded Thomas' and Devers' smoking and other lease violations, such as yelling at him through the walls.

108. And furthermore, Crump surely knew that KRS statutes 525.070 and 525.080, regarding harassment and harassing communications, respectively, required that Miller must have intended to intimidate, harass, annoy, or alarm, and that his communications would have to serve no legitimate purpose. Crump never alleged in his August 12, 2020, conversation with Miller, or elsewhere, that Miller's action constituted a violation of 525.070, rather Crump maintained that Miller's acts violated 525.080, even after Crump had seen a letter addressed to Miller, from David Higdon, dated May 12, 2020[31], which stated "although you do not believe the contents are threatening ..."

### FOURTH CLAIM FOR RELIEF - Warrantless Search
#### LEWIS CRUMP
(in all his capacities)

109. Miller incorporates herein by reference, paragraphs 102 – 108.

110. Crump violated Miller's 14th Amendment Rights.

111. Before obtaining his Search Warrant, Crump visited, on July 8, 2020, the office of S.O., where he was shown a packet of letters and emails regarding Miller tenancy. Among the documents viewed and/or collected that day, was a copy of the May 2, 2020, letter Miller sent to Devers and Thomas, documents related to Miller's HCV and the GHA, and Miller's personal identifying information, such as, e.g., his birth certificate, social security number, photograph, medical information, criminal history, income, and drivers license[32]. S.O., as a HUD "business partner", is subject to Federal law regarding Miller's privacy. In that consideration, S.O., without going through proper channels, such as prior written approval or a Search Warrant, did not have the authority to release Miller's Personally

---

[31] Miller never received such letter and did not know about until August 3, 2022, when he received Crump's Case File.
[32] From Crump's Report ¶¶ 23, 24, 25, 28, 29, and Crump's Affidavit ¶¶ 10 and 13.

Identifiable Information ("PPI"), and Crump was without authority, to access it. Personally Identifiable

Information, as defined by Federal law, is defined as

> "Information that can be used to distinguish or trace an individual's identity, either
> alone or when combined with other personal or identifying information that is linked or
> linkable to a specific individual",

and includes, but is not limited to, full name, social security number, driver's license number,

date of birth, telephone number, vehicle identifier or serial number, photograph or video

identifiable to an individual, biometric information, medical information, criminal history, and

other information related to an individual that may directly or indirectly identify that individual

(e.g., salary, performance rating, purchase history, call history, etc.).

112.   Furthermore, prior to receipt of his Warrant, Crump peered through Miller's apartment windows,

or attempted to do so, and held his ear to Miller's door and/or windows. Crump, despite his secretive

knowledge that Miller had never held himself out as a Federal Agent, pursued his unlawful agenda, by

chasing after Miller on trumped up charges, equivalent to a child stealing candy from a candy shop. Even

Crump, in his unlawful acts, did not stoop to the level of attempting to charge Miller with murder, or

armed robbery, or any other felony or high-level misdemeanor, and neither was Crump pursuing a

wanted felon, suspect during the commission of a crime, or any other exigent circumstance.

113.   And although Crump, acting with the Scott County Attorneys Office, cleverly and vaguely crafted

the Warrant such as to appear that S.O. must turn over all records, carte blanche, Crump's Affidavit

clearly reflected that he was seeking records relating to his claim that Miller had impersonated a peace

officer and had harassed Devers. Yet, Crump obtained numerous records that clearly did not, or could

not, lead to evidence of Miller's alleged wrong doing, such as Miller's income, rent payment, change in

rent amount, HAP contract, Housing Choice Voucher, move-in inspection, move-in check list, income

certification, supplemental information for demographics, annual income calculation, unemployment

affidavit, Income Verification Letter from the Social Security Administration, Certification of Child

Support and Alimony, Verification of Assets on Deposit requested from 1st Bank, Response from 1st Bank

providing Miller's checking account balance, Asset Certification, Resident's Acknowlegement of

Handouts (which listed, to Miller's favor, the No Smoking Policy), Community Rules, Schedule of Damage

Charges, Smoke Detector or Fire Stop Cannisters or Fire Extinguishers, Lead Paint Disclosure, or six

months of bank statements from 2 different banks.

### FIFTH CLAIM FOR RELIEF
*ALCO COMPANIES, JEMISON, HYDE, GULLETT and STOLTS – DISPARATE IMPACT*
*(Jointly and Severally, and as to these individuals, in all capacities)*

114.   Miller incorporates herein by reference, ¶¶ 109 - 113

115.   Stolts, Jemison, Hyde, Gullett, and the Alco Properties ("these seven defendants") knew that

Miller was male, knew of Miller's disability, and knew that, with a single exception, all the smoking

households that Miller brought to their attention, were female heads of household. Despite his

numerous complaints, these seven defendants, refused to act. To them, Miller, as a white male, was a

minority in the S.O. tenant demographic, so they were unconcerned. Thomas, 166A, and Devers knew of

Miller's disability, yet they continued to smoke because they knew from experience that neither of these

seven defendants would do anything about it. These seven defendants knew about all the smoking

occuring on S.O. property, not only from personal observation[33], but because Miller had not only

provided verbal and written statements, but videos and pictures as well, but they did nothing. Based

upon the shear magnitude of smoking occuring S.O., these seven defendants knew, or should have

known, that a majority of its tenants, mostly female heads of household, were smokers. These even

defendants could have, and should have, taken action to deal with the numerous violations, including,

but not limited to, installing security cameras, buying cigarette smoke detectors, leasing to fewer

smokers, or aggressively enforcing smoking policies, which could result in evictions, but that would have

---

[33] 80% of the households were smoking households and there was cigarette butts all over the property, all of the time.

impacted their mostly female, mostly smoking tenancy, which they did not want to disturb. For over a year, these seven defendants, ignored and disregarded Miller's complaints that because of all the smoking, he was suffering from sleep deprivation. In reality, these seven defendants established an unwritten policy that the interests of women and the non-disabled, came before Miller's constitutional rights against discrimination. Miller brings this claim for violation of the Fair Housing Act pursuant to 24 CFR 100.500 and 42 USC Chapter 45.

### SIXTH CLAIM FOR RELIEF – Violation of Due Process
*STOLTS, HYDE, JEMISON, and ALCO COMPANIES*
(Jointly and Severally, and as to the Individuals, in all capacities)

116.   Miller incorporates herein by reference, paragraphs 114 – 117.

117.   As the recipient of a HCV and as a tenant in a property receiving Low-Income Housing Tax Credits, Miller was to have been provided a meeting with S.O., to discuss the Notice to Vacated; not only is that law, but it was enumerated in Miller's Intitial Lease, clause 24.d. Community House Rules, Paragraph 10. Though Miller requested a meeting, Stolts, Hyde, Jemison, and the Alco Companies denied him.

### SEVENTH CLAIM FOR RELIEF – Fraudulent Misrepresentaton
*STOLTS, HYDE, JEMISON, and ALCO COMPANIES*
(Jointly and Severally, and as to the Individuals, in all capacities)

118.     Miller incorporates herein by reference, paragraphs 116 – 117.

119.     Alco Management and its CEO and President, Jemison and Hyde, respectively, represented that Southern Oaks Apartments were smoke-free. Not only were there 5 non-smoking signs posted about the property, but the leases had a non-smoking provision. They knew, or should have known, that there was a smoking problem, because the grounds were litered with cigarette butts, they had sent out notices about their smoking policy, over 80% of the households on the property were smoking households, and tenants and their friends/family/associates, walked about the property openly smoking. As was apparent from

the signage and non-smoking lease provisions, Southern Oaks intended their smoke-free environment to draw people who wanted to live on a non-smoking property, and it certainly did it Miller's case. Miller moved into Southern Oaks, giving up the potential of renting at 4 other nicer complexes, for the sole purpose of living on their alleged smoke-free property. As the result of his reliance on this alleged smoke-free property, which in all actually should have been advertised as "smoking allowed", Miller ended up in a quadplex where he was the only non-smoker, and as a disabled person with respiratory issues that are exacerbated by cigarette and cigar smoke, his life was hell, and became more so, as his neighbors in 166A, 166B, and 166C, tipped off by Ross, that Miller had complained about him, stepped up their antics, all lease violations, by banging on his walls, slamming their doors, etc.

DAMAGES

The Defendants' conduct has been motivated by evil motive or intent or was otherwise reckless or callous indifference to Miller's federally protected rights.

WHEREFORE, Miller prays for the following relief:

1. For a trial jury;

2. Judgment against the Defendants, jointly and severally, for a reasonable sum to compensate Miller for his injuries and damages, including past and future lost compensation, expenses incurred resulting from Miller's removal from 166D Fairfax Way, 40324, recovery for physical, mental, and emotional distress, and all other damages recoverable by law;

3. For Miller's attorneys' fees and costs herein pursuant to 42 USC §§ 1983, 1988, and 3613, as well as recovery of such cost as set forth under other applicable State or Federal law;

4. Pre and post judgement interest;

5. Punitive damages;

6. Injuction, as set forth herein above, and

7. For any and all relief to which Miller shall appear entitled.

Respectfully submitted,

_Ron Miller_

**Ron Miller**

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2022.

_Ron Miller_

**Ron Miller**

Subscribed, affirmed, and sworn to before me in Scott County, State of Kentucky, this 11th day of August 2022, is **PLAINTIFF'S AFFIDAVIT IN SUPPORT OF COMPLAINT FOR VIOLATION OF FAIR HOUSING ACT & CIVIL RIGHTS,** reflecting the court as UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF KENTUCKY, LEXINGTON DIVISION.

My Commission Expires: ___02/16/2026___

_Amanda M Brooks_

**Notary Public**

Amanda M. Brooks
Notary Public, Kentucky State at Large
My Commission Expires
February 16, 2026
Commission # KYNP43457